[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case involves a six count complaint instituted by the former wife Veronica Tisdale, hereinafter "Tisdale", against her former husband Earl Munroe, Hereinafter "Munroe" and against Keisha Grier, hereinafter "Grier" the girl friend of Munroe, now the second wife of Munroe.
In the First Count against Munroe, Tisdale alleges inter alia assault and battery upon Tisdale; in the, Third Count Tisdale alleges "restlessness and or misconduct in his attack upon Tisdale and in the Fifth Count Tisdale alleges the negligence of Munroe in his attack upon Tisdale.
Tisdale alleges similar accounts as against Grier in the Second, Fourth and Six Counts respectively.
On October 4, 1997, about 2:30 p.m., Tisdale was dropping off her son, A'Chan Munroe, hereinafter "A'Chan", who is five years old, for visitation at Munroe's residence at 50 Vernon Street, New Haven. Prior to this occasion the parties had been involved in a dispute concerning the custody of A'Chan. Munroe and Grier had made complaints to Tisdale's supervisor at her place of employment and with the Department of Children and Family ("DCF") about her parenting fitness. After dropping off A'Chan, Grier came to the door and shouted something to Tisdale causing Tisdale to back up her car. Tisdale exited the car and was standing at the side of the car when Grier came down the steps and to the car.
Tisdale testified that Grier grabbed her at the top of the head and grabbed her arm, attacking her. Tisdale started to fight back and Munroe came down to separate them and he struck her in the mouth. Tisdale was not sure when he struck. Tisdale, after being struck by Munroe with his fist to her mouth, fell to the concrete pavement and woke up two days later at the hospital. When Tisdale woke up she did not know where she was until she was told by her mother. Tisdale was hospitalized for one week then removed to Gaylord Hospital for two weeks. The hospital record (Exhibit 2) reveals that Tisdale suffered a grand mal seizure after the attack. Tisdale testified that she was later told she might not make it through the night when first brought into the hospital. The court will CT Page 14596 later in this decision reveiw the medical reports, testimony and bills incurred.
In 1999 Munroe gave up his parental rights to A'Chan. Munroe testified he came down from his house when he observed Tisdale and Grier engaged in a hair pulling altercation. Munroe parted them and directed Grier to go back into the house. Munroe testified that Tisdale went after Grier with a bottle to hit Grier and that as he was pushing her he threw up his hands and stepped back as Tisdale fell to the ground and struck the concrete pavement. Munroe asserted that all he was doing was trying to separate Tisdale and Grier. Under cross examination Munroe stated he was telling Grier to go back into the house which she resisted at first. He testified that Tisdale went into the back of her car, got a bottle and was chasing Grier to hit her and that he took the bottle from Tisdale before she could get close enough to Grier to use it. Munroe testifed he took the bottle away from Tisdale. Munroe denies punching her or using any object when he pushed her back. Munroe claims he was not wearing a watch that day and does not know whether she fell back intentionally or staged her fall so as to hit the ground. Munroe admitted however that Nicole Tyson ("Tyson"), a cousin to the plaintiff who was in the car when Tisdale delivered A'Chan for visitation. Tyson testified that Grier started cursing and pulled Tisdale by the hair and to the ground. From her testimony this court concludes that Grier started the altercation which blew up to be a serious altercation between the parties. Tyson further testified that Munroe punched Tisdale in the face when she was trying to get around him to get to her son. Tyson further testified that after the punch Tisdale was on the ground bleeding.
Tyson testified that during the altercation Tisdale never had anything in her hand or ever took anything out of the car. Tyson testified she saw a big silver wrist watch fall out of Munroe's hand and that the punch inflicted by Munroe caused Tisdale to fall to the ground. Tyson testified that Tisdale was trying to get to her son and was being restrained by Munroe and that Grier was going to the house after being ordered to do so by Munroe. Tyson testified Munroe held Tisdale while Grier kicked her.
The court concludes from all the conflicting evidence that the more credible evidence was provided by Tyson. The court concludes that the altercation was started by Grier, and that after this altercation, although the hair pulling and fighting is somewhat in the gray area, Munroe committed the most striking incident to the occassion by striking Tisdale in the mouth where she fell to the ground striking herself with great force. There is no evidence that Tisdale used unreasonable force under the circumstances to either party.
Tisdale alleges in the First and Second Count both defendants, Munroe CT Page 14597 and Grier participated in assault and battery upon her. The plaintiff also points out that the assault and battery upon Tisdale was not alleged to be in self defense.
The plaintiffs post trial memorandum states "A common law trespass provides a remedy for "all forcible, direct and immediate injuries whether to a person or to property, for that kind of conduct likely to lead to a breach of peace by provoking immediate retaliation. It must also be stated that the resulting injury to plaintiff must be deemed to be intentional where bodily harm inflicted was a direct and actual consequence of the offensive conduct engaged in by the defendant and co-defendant" (citations omitted; see page 5 of Plaintiffs Post Trial Brief).
The plaintiff further argues that the defendants were reckless in the third and fourth counts. The plaintiff argues that "recklessness claimed by the plaintiff in the instant matter involved highly unreasonable conduct, which represents an extreme departure from ordinary care in a situation where a high degree of danger is present." This court agrees that the defendant Munroe, punching the plaintiff as he did, makes him more culpable for the cause of action sounding in recklessness, than one alternately sounding in mere negligence. Brown v. Branford,12 Conn. App. 106 (1987)
As to the Fifth and Sixth Counts against both defendants, the plaintiff argues that negligence is a breach of duty. "A duty to use care arises from circumstances in which a reasonable person, knowing what he knew or should have known, would reasonably anticipate the harm that was suffered and said harm was likely to result from his actions." (Citations omitted see page 9 of Plaintiffs Post Trial Brief)
This court finds in favor of the plaintiff as to all six counts in the complaint and awards damages as follows:
The plaintiff argues that when Tisdale was brought to the hospital by ambulance she did not know what hit her and she was found to have a large laceration on her upper lips. She had a frontal temporal contusion from which she suffered a grand mal seizure. The laceration to her lips was repaired but remained swollen for many days. She experienced headaches, had no appetite, refused liquid supplements. Dr. Stugar diagnosed the plaintiff as suffering from cognitive dysfunction. The plaintiff required assistance to walk and experienced a deviation in her normal gait. She was later transferred to Gaylord Hospital on October 8, 1997. There was some difficulty with Tisdale's short term memory. She also had communication cognitive difficulties. She received treatment from the Gaylord Staff for six weeks. Dr. Michael Westerveld's report dated CT Page 14598 01/27/98 (Exhibit 7) states:
"The results of the present examinations are essentially within normal limits. Ms. Tisdale reportedly suffered a traumatic brain injury and subdural hematoma in October, with associated acute cognitive impairments. A summary of findings from her hospitalization at Gaylord reported problems with attention and concentration, deficits in comprehension for task instructions and complex auditory materials, impaired learning and memory (short term recall as well as delayed recall) and impaired visuopatial functioning. Although the scores obtained by Ms. Tisdale are not included in the report, assessment of these areas today reveals adequate functioning in all areas and suggests recovery to premorbid levels. Ms. Tisdale's Full Scale IQ score of 88 places her in the low average range of overall ability, however the pattern of findings suggests that this level of functioning is within the same range as her premorbid ability, and does not represent a clinically significant decline. In sum, the patient does not appear to have significant defects in cognitive functioning which are a result of the traumatic brain injury suffered in October of 1997. It is my opinion that she should be able to fulfill her job duties to the same degree as she was able to before the injury, and she should be allowed to return to work from a neuropsychological standpoint."
Tisdale claims she was unable to work from October 7, 1997 through November 21, 1997. She further testified her performance in her work was impaired after the attack and that her job performance evaluation went from excellent downward and that she received several warnings as a result of her emotional devastation suffered from her trauma. Accordingly she claims a loss of wages of $11,768 (Page 16 of Post Trial Memorandum of Plaintiff). The medical expenses are outlined as follows:
American Medical Response 10/4/97 10/8/97 $368.00
Yale-New Haven Hospital 10/4/97 — 8/21/98 19,450.22
 Gaylord Hospital 10/8/97 — 4/00 10,903.59 In-patient and out-patient
 Dr. John Stugar, 10/6/97 — 1/27/98 2,300.00 Yale University School of Medicine Department of Neurology
 Dr. Norman S. Werdiger, 11/5/97 10/12/98 325.00 Neurologist
Dr. Paul Fortgang 12/24/97 — 8/11/00 2,173.50 CT Page 14599 ENT Plastic Surgery
 Dr. Joanne Foodim, CHCP 10/24/97 Medical Doctor
Total $35,520.31
The plaintiff placed in evidence a life expectancy of 45 years (Exhibit 14). Other than her depression, no permanency has been demonstrated to the court excepting the effect on her economic future.
The plaintiff seeks $147,288.31 in economic and non-economic damages (pain and suffering) and exemplary damages. The circumstances leading up to the punch would not justify exemplary damages as to Grier and the punch was not of such great force except for the force of the plaintiff striking the concrete pavement. Accordingly this court does not award punitive damages in this case.
The court finds that the plaintiff shall recover from defendants the following:
 Economic Damages $ 47,288.31 Non Economic Damages $100,000.00 Total $147,288.31
Frank S. Meadow, J.T.R.